### ARGUED AND DETERMINED

###### IN THE

# SUPREME JUDICIAL COURT

###### OF

# MASSACHUSETTS.

SUFFOLK SAVINGS BANK FOR SEAMEN AND OTHERS,
petitioner.

Suffolk.    January 31, February 1, 1889. — March 1, 1889.

Present: MORTON, C. J., FIELD, W. ALLEN, C. ALLEN, & HOLMES, JJ.

*Savings Bank — State Tax — Banking Building — Exemption — "Deposits."*

Under the Pub. Sts. c. 13, § 20, exempting from a State tax so much of savings
bank "deposits as are invested in real estate used for banking purposes," the
exemption extends to the whole of a bank building erected by such a bank
under the authority conferred by the Pub. Sts. c. 116, § 20, cl. 7, and is not
confined to that part of it actually used in the transaction of its business.

The "deposits" exempted from such tax denote all the funds received from depos-
itors and held by the savings bank for investment, including profits and the
guaranty fund required by the Pub. Sts. c. 116, § 24.

PETITION filed July 31, 1888, under the Pub. Sts. c. 13, § 64,
for the abatement of a State tax upon that part of the petition-
er's bank building in the city of Boston not actually used in its
business, on the ground that it was already taxed by the city.
Hearing upon the pleadings before *Field*, J., who reserved
the case for the consideration of the full court, in substance
as follows.

The petitioner began to erect the main portion of the building
in question, which was numbered 47 to 53 Tremont Street in

Boston, in 1870, upon land purchased by the bank about that time.  The books of the bank showed that $150,000 of the funds of the bank were on May 1, 1888, invested in such land and building, an amount less than ten per cent of its deposits, of which $112,500 were invested in that portion of the building actually used by it in its business.  The building consisted of five stories, of which the lowest was a basement, and the first floor and a portion of the rear of the basement were used for banking purposes.  All the rest of the building, including the front of the basement and the rooms above the first floor, was rented or to let, the rents thereof, if it was entirely occupied, amounting to $10,350.  The lot on which the building stands is no larger than was necessary for the erection of a building sufficient to satisfy the needs of the bank in the convenient transaction of its business.  The bank absolutely requires all of the first or principal floor of the building actually erected for the purposes of its business, and could not conveniently use for its business the rooms above the first floor.  In erecting the building for the use of the bank, it was a prudent investment of money to erect a building more than one story in height, and the building actually erected was in this respect no higher, nor did it contain more stories in front, than were reasonably necessary in order to make the best use of the land purchased.  Although the bank could not properly or conveniently do its business in the rooms above the first floor, or wholly in the basement, yet it would have been unwise management to have invested its money in the erection of a building upon this lot of land which should contain neither such rooms nor basement.  The site was a suitable site, and the building erected was a suitable building to be used for banking purposes by the petitioner, and for the convenient transaction of its business.

From 1876 to 1888, the bank set apart in each year a guaranty fund, which in May, 1888, amounted to $452,498.93, and from 1870 to 1888 the bank also held moneys which were carried on its books as profits, which in 1887 amounted to $183,518.63.  This guaranty fund and such profits were mingled with other moneys of the bank, and were invested indiscriminately with other moneys.  The profits and guaranty fund have never been

included in the sums upon which any State tax has been paid. The bank held varying amounts of cash from 1870 to 1888, which in 1887 amounted to $34,367.56. The books of the bank do not show any separate investment of what is called by them "deposit money," "guaranty fund," or "profits," or that the bank building was constructed distinctively out of either of such funds.

On these facts the judge ruled that the petitioner was entitled to the abatement.

*F. C. Lowell*, for the petitioner, cited *De Soto Bank* v. *Memphis*, 6 Baxter, 415, and *Bank* v. *Tennessee*, 104 U. S. 493; *Salem Iron Co.* v. *Danvers*, 10 Mass. 514; *Boston & Sandwich Glass Co.* v. *Boston*, 4 Met. 181, 186; *Murray* v. *Berkshire Ins. Co.* 104 Mass. 586; *American Bank* v. *Mumford*, 4 R. I. 478; *Augusta Savings Bank* v. *Augusta*, 56 Maine, 176; *New Haven* v. *City Bank*, 31 Conn. 106; *Toll-Bridge Co.* v. *Osborn*, 35 Conn. 7; *Osborn* v. *New York & New Haven Railroad*, 40 Conn. 491; *State* v. *Collector of Chambersburg*, 8 Vroom, 258; *Coatesville Gas Co.* v. *Chester*, 97 Penn. St. 476.

*H. C. Bliss*, First Assistant Attorney General, for the Commonwealth, cited *Commonwealth* v. *People's Savings Bank*, 5 Allen, 428; *Oliver* v. *Washington Mills*, 11 Allen, 268; *Cambridge* v. *County Commissioners*, 114 Mass. 337; *Huntington* v. *Savings Bank*, 96 U. S. 388.

HOLMES, J. This is a petition under the Pub. Sts. c. 13, § 64, for an abatement of a tax upon so much of the petitioner's bank building as is not actually used by it for the transaction of its business. It appears from the report of the justice who tried the case that the building covers no greater area than is necessary for a suitable building; but in the prudent management of the land it was proper to build it with more stories than were needed for the use of the savings bank, and that has been done. These stories the petitioner lets, and it is with regard to these that the question is raised.

By the Pub. Sts. c. 116, § 20, cl. 7 (St. 1876, c. 203, § 9, cl. 6; St. 1870, c. 226), " Ten per cent of the deposits of any such corporation, but not exceeding two hundred thousand dollars, may be invested in the purchase of a suitable site and the erection or preparation of a suitable building for the convenient transac-

tion of its business." This section authorized the petitioner to erect such a building as it has built. It is not argued that the additional stories were beyond the authority conferred, and the original act of 1870 expressly recognized the possible necessity of building so that there would be some space not needed for banking purposes, by requiring all income arising from such real estate to be devoted exclusively to the interests of the corporation.

The next clause of the Pub. Sts. c. 116, § 20, (St. 1876, c. 203, § 26,) authorizes savings banks to hold real estate acquired by foreclosure or mortgage sale for five years. These are the only cases in which the statutes have provided for savings banks holding real estate.

By the Pub. Sts. c. 13, § 20, savings banks are to pay a State tax, on account of their depositors, assessed on their deposits, " provided that so much of the deposits as are invested in real estate used for banking purposes, or in loans secured by mortgages of taxable real estate, shall be exempt from taxation under the provisions of this section, and that so much of said deposits as are invested in real estate, the title to which has been acquired by the completion of foreclosure, or by purchase under the provisions of section twenty of chapter one hundred and sixteen, shall be exempt from taxation under the provisions of this section for the period named in said section." It is manifest that the purpose of this section is to avoid double taxation, and that purpose is expressly declared by the St. of 1881, c. 304, from which this section is taken. The act of 1881 is entitled, " An Act relieving property from double taxation in certain cases."

The general purpose of the act being thus apparent, it is carried out by exempting all land which savings banks are authorized to hold, unless a slight variation in phraseology as to the bank building makes an exception in that case; the plain reason being that all the land is subject to local taxation in the city or town where it lies. For a similar reason, funds invested in loans secured by mortgages of taxable real estate are also exempted. For this part of the discussion it does not matter whether the theory on which the Legislature proceeds is true or not, although we see no reason to doubt its substantial correctness. It is enough for purposes of construction that the

statute does proceed upon that theory expressly. And this being so, it is manifest that those parts of an authorized bank building which are not used for banking purposes are as much within the supposed evil sought to be remedied as those which are occupied by the bank. A general view of the objects of the act leads to the conclusion that the petitioner's contention is right.

The language of the act leads to the same result. " So much of the deposits as are invested in real estate used for banking purposes," on the face of it, refers to all the deposits invested in that land, and to the whole piece of land. The case is unlike *Cambridge* v. *County Commissioners*, 114 Mass. 337, both in the language used and in the purpose of the statute to be construed. There the statute under consideration, Gen. Sts. c. 11, § 5, cl. 3, was one absolutely exempting literary institutions, etc. from taxation on real estate belonging to such institutions, occupied by them or their officers, for the purposes for which they were .incorporated, and it rightly was assumed by both parties, and by the court, that the exemption was confined to the portion of a building actually occupied for the purposes mentioned. *Pierce* v. *Cambridge*, 2 Cush. 611. · *Chapel of the Good Shepherd* v. *Boston*, 120 Mass. 212. ˙ *Lynn Workingmen's Aid Association* v. *Lynn*, 136 Mass. 283. In *Bank* v. *Tennessee*, 104 U. S. 493, it was assumed that the exemption was coextensive with the authority given the bank, although it was held, following the decision of the Supreme Court of Tennessee in the same case, *De Soto Bank* v. *Memphis*, 6 Baxter, 415, that the authority was confined to so much of the building as was actually necessary for the use of the bank. The case is too unlike the present to throw much light upon it.

It is argued for the Commonwealth, that it does not appear that all the funds invested in this bank building are deposits of the bank, within the words of the Pub. Sts. c. 13, § 20, because, so far as appears, a part of the guaranty fund required by the Pub. Sts. c. 116, § 24, (St. 1876, c. 203, § 13,) to be set aside from the net profits of the last six months at the time of making a semiannual dividend may be represented by the bank building. The building was built in this case before a guaranty fund was required by law. But the true answer to this contention is, that

§ 20 of the Pub. Sts. c. 13, does not contemplate any such distinction between the guaranty fund and other funds of the bank.

The tax imposed by that section is assessed on the average amount of the bank's deposits during the six months preceding May 1 and November 1, respectively. Deposits here mean the amounts with which the bank stands charged on its books as received from depositors, not any particular part of the investments of the bank. Then the statute goes on to exempt so much of the deposits as are invested in the specified ways. It is very plain that the word "deposits" is used in the second half of the section in substantially the same sense as in the first half. It means the total amount received for which the bank is accountable. But it does not mean merely the identical money received, it means the fund now representing the original deposit and assumed to be equal to it. But the guaranty fund is a part of that fund. If it were not contemplated that it might be needed to repay the depositors the amount put in by them, it would not be required. The declared purpose of it is to meet losses in the corporation's business, from depreciation of its securities, or otherwise.

When the act of 1881 proclaimed the purpose to relieve property from double taxation, it plainly assumed, for purposes of practical justice, that a tax on average deposits came to about the same thing as a tax on the bank's investments at a valuation of them. An exemption of certain property to avoid double taxation would have been absurd, unless the tax on deposits practically taxed that property. But if so, a tax on all the deposits was treated as equivalent to a tax on all the property, not a tax on some selected part not mentioned. The statute gives no color to the notion that investments less profits and guaranty fund are taken to be equal to the deposits. As we have just said, if so, why require a guaranty fund? Moreover, it is to be remembered that, while the result in the case of a successful bank may be that a small proportion of its total assets may escape taxation, if unsuccessful it has to pay the same tax, although it has no profits, and its total assets, including the guaranty fund, are not enough to pay the deposits in full. We are of opinion that the word "deposits" is used in this part of § 20 to signify all the funds which the bank holds for investment.

*Decree for petitioner.*